In re Application of Northwestern Bell Telephone Company for an Order Sanctioning Temporary and Permanent Increases in Rates and Charges for Telephone Service Furnished by the Company within the State of Minnesota—Public Service Commission, File No. M–5405.

NORTHWESTERN BELL TELEPHONE COMPANY, applicant, Appellant,

v.

STATE of Minnesota, intervenor, Respondent,

Minnesota Public Service Commission, Respondent.

No. 47028.

Supreme Court of Minnesota.

April 29, 1977.

Maun, Hazel, Green, Hayes, Simon & Aretz, Joseph A. Maun, Lawrence J. Hayes, James A. Gallagher, Melvin R. Quinlan and Garfield E. Lovass, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Byron E. Starns, Chief Deputy Atty. Gen., Michael P. Sullivan and Michael R. Cunningham, Sp. Counsel, Minneapolis, for State.

John Van De North, Jr., Sp. Atty., Minneapolis, for Minn. PSC.

SHERAN, Chief Justice.

Northwestern Bell Telephone Company (Bell) appeals from three orders of the district court which affirm in part and reverse in part certain orders entered by the Public Service Commission (PSC) in a proceeding before that body to consider the application of Bell for temporary and permanent rate increases. The State of Minnesota appeared as an intervenor in the proceedings before the PSC and in the district court and seeks review of two of the district court orders. The PSC also seeks review of those two orders.

The PSC entered its initial report, findings of fact, conclusions of law, and order on the Bell application on November 22, 1974. Both Bell and the state appealed from that order to the district court. On June 27, 1975, the district court entered its order which affirmed certain findings of the PSC and remanded the proceedings for further consideration of certain of the other findings. Bell applied to this court for leave to appeal from that order, and discretionary review was granted solely upon the issue of the district court's authority to order a remand. We held that the district court did possess such authority. *In re Northwestern Bell Tel. Co.*, Minn., 246 N.W.2d 28 (1976). That decision was without prejudice to Bell's right to seek review of any final disposition of the matter by the PSC or the district court.

Upon remand, the PSC made additional findings of fact and conclusions of law, and entered an additional order. Bell then petitioned the PSC for a rehearing, seeking amendments to the remand order, which petition was denied. Again, an appeal was taken to the district court. The district court ordered a stay of all PSC remand orders, and then reviewed those issues which had been remanded to the PSC. On June 29, 1976, the district court affirmed the actions of the PSC on the remand issues and the denial of Bell's petition for rehearing. The instant appeal was then taken.

In *Northwestern Bell Tel. Co. v. State*, 299 Minn. 1, 5, 216 N.W.2d 841, 846 (1974), we summarized the rate-making process:

"The process by which rates are fixed is, first, to determine the value of the company's property represented by the equity of its stockholders; second, to establish a fair rate of return which will provide earnings to investors comparable to those realized in other businesses which are attended by similar risks, will allow the company to attract new capital as required, and will maintain the company's financial integrity; and, third, to compute corporate taxes, depreciation reserves, and other expenses of operating the company. The rates charged subscribers are thereupon authorized in an amount which will equal the sum of the return to investors and the company's operating expenses."

The parties raise several issues on appeal which, for the purposes of discussion, may best be considered as they relate to the determination by the PSC of the rate base, the rate of return, and the operating expenses of Bell, and the actions of the district court in reviewing those determinations.

■ 1. *Rate Base.* In the context of public utility regulation, "rate base" represents the total investment in, or fair value of, the facilities of a utility employed in providing its service. Not all of the property owned by a utility is necessarily includable in its rate base; the property generally must be used to help provide the service offered by the utility. Moreover, since the point of rate regulation is to provide an adequate but not excessive rate of return to investors, property which is acquired in some manner other than the investment of stockholders' equity is generally not includable in the rate base. *Northwestern Bell Tel. Co. v. State*, 299 Minn. 1, 5, 17, 216 N.W.2d 841, 846, 852.

In addition to determining what property comprises the rate base, the PSC must assess the "fair value" of that property. Minn.St. 237.08 prescribes the considerations pertinent to that valuation:

"* * * In determining the valuation of any telephone property for the purpose of prescribing reasonable rates, the department shall give due consideration to evidence of the cost of the property when first devoted to public use, prudent acquisition cost to the telephone company less depreciation on each, current values thereof and any other factors or evidence material and relevant thereto."

■ The PSC determined that the fair value of Bell's intrastate property was $809,301,492. The state asserts five instances of alleged error in the PSC rate-base determination:

(1) Failure to deduct from the rate base the amount of Bell's negative working capital and the amount of accounts payable from Bell to Western Electric Company;

(2) Failure to adequately account for obsolescence in valuation of the rate base;

(3) Failure to consider lack of a depreciable tax basis of certain Bell property in valuation of the rate base;

(4) Failure to adequately deal with "lag factors" used in computing telephone plant indexes;

(5) Improper weighting by the PSC of trended current value in valuation of the rate base.

Bell contends that the PSC properly dealt with these issues. Neither Bell nor the PSC raises any other issues relative to the rate-base determination.

We have reviewed the record carefully relative to these matters and have concluded that the PSC acted properly in determining Bell's rate base. We have only these comments:

Much is made of Bell's maintenance of a negative-working-capital status. The record shows this to be an exercise of business judgment by Bell. The PSC was cognizant of the fact that the rate base properly includes only property which is obtained with investor-supplied capital. This does not include property purchased "on account" or with other credit, unless and until the debt is paid. The PSC strove to determine to what extent any Bell purchases made with negative working capital were included in the rate base. In many instances it was not possible for specific purchases to be traced through to determine when they were made and whether they were paid for. We recognize the difficulty in such an endeavor and are satisfied that the PSC acted reasonably and properly in making as nearly certain as possible that the rate base did not contain property it should not. We are confident, however, that the PSC will continue to become increasingly more strict in the future in requiring Bell to prove the extent of the property properly included in its rate base with specificity.

We are not yet completely satisfied with the manner in which the subject of obsolescence was treated by the PSC. However, we realize that the subject is one which is both conceptually difficult and not susceptible of concrete proof. We conclude that the subject was adequately dealt with in these proceedings, but emphasize that continued efforts should be made to deal with this aspect of rate-base valuation.

■ 2. *Rate of Return.* In its first order, the PSC determined that a rate of

return of 7.97 percent was "within a zone of reasonableness," and adopted that rate in order to determine Bell's revenue requirements. On the first appeal to the district court, the court felt that this figure was unsupported by the evidence and remanded with instructions that the rate of return reflect a maximum return on common equity of 12 percent. On remand, the PSC, without taking any additional testimony on the subject, merely recomputed the overall rate of return based upon a 12–percent return on common equity. The resultant overall rate of return of 7.64 percent was affirmed by the district court on the second appeal.

The parties make much of the fact that the district court, in its first order, was critical of the method by which the PSC arrived at the 7.97–percent rate of return. It should be kept in mind, however, that the court also felt that there was an insufficient evidentiary basis for the final figure, irrespective of the method of its derivation.

Three principal witnesses testified regarding rate of return—Dr. Paul J. Garfield, Dr. Charles E. Olson, and Mr. Pat A. Loconto. Dr. Garfield, an economist, testified on behalf of Bell. He concluded that Bell required a rate of return of 8.6 percent on its fair-value rate base. He reached this conclusion primarily by comparing Bell's earnings to other enterprises, in order to determine the necessary "earnings opportunity" required to give Bell a fair rate of return. Dr. Garfield examined a wide range of enterprises, and concluded that the "preliminary range of alternative earnings opportunities useful for consideration here is 10.0 percent to 12.0 percent fair value return." He proceeded to consider the effects of capital structure ratios, relative levels of risk, nature of enterprise, and other "interrelated economic factors." He concluded that the *fair value* rate of return required to make AT&T common stock "reasonably competitive" was at least 10.5 percent.

Dr. Garfield then proceeded to redetermine the rate of return by the discounted-cash-flow method. From this method, Dr. Garfield concluded that a rate of return on common equity of 11.0 percent was appropriate. Considering both methods, he was of the opinion that the *fair value* rate of return on common equity should be "at least" 10.5 percent. From this, Dr. Garfield reached his overall recommendation of a rate of return on the fair-value rate base of 8.6 percent.

Dr. Olson, also an economist, testified on behalf of the state. He utilized the cost-of-capital approach, analyzing the cost of the debt capital, the cost of preferred stock, and by means of the discounted-cash-flow method, the cost of common equity. He concluded that the cost of equity to AT&T was 11.0 percent. Dr. Olson was of the opinion that the fair rate of return for Bell should be between 8.65 percent and 8.80 percent, applied however, to the book value, as opposed to the fair value, of Bell's rate base. If the fair value were determined to be higher than book value, Dr. Olson would have adjusted the rate of return downward. This computation was reflected in an exhibit presented to the PSC, and, using the book value and fair value of the rate base finally found by the PSC, it results in a rate of return on fair value of approximately 7.2 percent.

Mr. Loconto, a certified public accountant with experience as a witness in many rate hearings, testified on behalf of the PSC. He also used a cost-of-capital approach in order to determine an appropriate rate of return. He determined the cost of imbedded debt, preferred stock, and, by the discounted-cash-flow method and the comparable-earnings method, the cost of common equity. Based upon his analysis, Mr. Loconto concluded that the cost of common equity to Bell was between 11.0 percent and 11.5 percent on original cost, or an overall rate of return of between 8.64 percent and 8.86 percent. For simplicity's sake, he recommended 8.75 percent, the average. Mr. Loconto recognized that this figure was not applicable to a fair-value rate base. He recommended that his rate of return be adjusted by the percentage of fair value over original cost less depreciation. This

resulted in a range of 7.23 percent to 7.42 percent return on fair value.

The expert opinions regarding the proper rate of return on fair value of the rate base may be summarized:

| | |
|---|---|
| Dr. Garfield | 8.6 percent |
| Dr. Olson | 7.2 percent |
| Mr. Loconto | 7.23 to 7.42 percent |

The district court's directive that the rate of return be recalculated based upon a maximum return on common equity of 12 percent was apparently based upon the recognition that the other two factors relied upon by the expert witnesses in arriving at the rate of return, namely cost of imbedded debt and preferred stock, are fairly fixed. Rate of return on common equity is the principal varying factor. The court felt that the rate of 7.97 percent would allow a rate of return on common equity in excess of 14 percent, clearly beyond the range of any of the expert testimony. The PSC on the other hand felt that the rate of 7.97 percent would yield a return on common equity of only 12.87 percent, and felt that this was within the range of expert testimony, as the PSC saw it, of 11.0 percent to 13.7 percent. (While Dr. Garfield gave all of his direct testimony in terms of "fair value" rates of return, he agreed that his recommendation of 10.5 percent return on *fair* value of common equity could accurately be converted by calculation to a 13.7–percent return on *book* value.) A review of the calculation upon which the 12.87–percent figure is based convinces us that this is indeed the rate of return on book value of common equity which will result from a 7.97–percent return on the fair-value rate base as determined by the PSC. The range of testimony on return allowable to book value of common equity can be summarized:

| | |
|---|---|
| Garfield | 13.7 percent |
| Olson | 11.0 percent |
| Loconto | 11.0 to 11.5 percent |

Thus it appears that the PSC's determinations of an overall rate of return on fair value of 7.97 percent, and a 12.87–percent return on book value of common equity fell within the range of the expert testimony

both as to the overall rate of return on fair value and return on book value of common equity:

| | Rate on over-all fair value | Rate on common equity book value |
|---|---|---|
| Garfield | 8.6 percent | 13.7 percent |
| Olson | 7.2 percent | 11.0 percent |
| Loconto | 7.23 to 7.42 percent | 11.0 to 11.5 percent |
| PSC | 7.97 percent | 12.87 percent |

The district court, perhaps having been misled by the different kinds of evidence, impermissibly restricted the PSC's determination. As we said in the prior *Bell* case:

"We have previously noted that the fixing of a fair rate of return cannot be determined with precision, since it is not derived from a formula, but must be reached through the exercise of a reasonable judgment, applying the criteria to which we have referred. Ratemaking is a legislative and not a judicial function. In complex cases such as this, the court should, and does, accord the commission great deference in reviewing its decision. The rates fixed by the commission are presumed to be reasonable and just until the contrary is shown by clear and convincing evidence. In this area, the court's only function is to protect constitutional rights and not to substitute its own judgment for that of the commission." 299 Minn. 27, 216 N.W.2d 857.

The district court erred in substituting its judgment for that of the PSC.

3. *Operating Revenues.* The PSC determined that the appropriate rate base had a fair value of $809,301,492, and that a reasonable rate of return was 7.97 percent. Applying the rate of return to the rate base, Bell was thus entitled to earn revenues for the 1973 test year of $64,501,329. The PSC sought to determine additional revenues for that year, if any, which Bell was authorized to receive. The PSC found that Bell had adjusted test-year operating income of $49,759,435, which represented a return on the fair-value rate base below the rate found to be appropriate. The PSC determined that the revenue deficiency was

$34,849,000. To this test-year deficiency the PSC added an additional $3,855,500, representing an increase in wages payable by Bell under a newly negotiated wage contract with the Communication Workers of America (CWA). The total revenue deficiency was thus determined by the PSC to be $38,704,500, and Bell's rates were ordered adjusted accordingly.

In light of the district court's order on rate of return and the subsequent reduction of the rate to 7.64 percent by the PSC, the net operating income requirement was recomputed. The result was a total revised operating revenue deficiency of $29,900,605. The PSC ordered Bell to again revise its rates accordingly.

Two issues are raised regarding the computation of the operating revenue deficiency, one pertaining to the computation of Bell's net operating income and the other pertaining to the inclusion of the CWA wage contract increase in determining Bell's revenue requirement.

■ (a) *Net Test-Year Operating Income.* The PSC initially determined that Bell's adjusted test-year operating income was $49,759,435. On appeal, the district court held that as a matter of law the PSC erred in failing to include in that figure a tax benefit of $1,024,177 derived from the interest deduction taken by AT&T on its consolidated tax return, in which Bell was included as a subsidiary. The PSC was ordered to recompute the operating revenue upon remand to include this figure, which it did.

The crux of this issue is whether Bell receives a tax benefit as a result of its participation in the filing by AT&T of a consolidated Federal tax return. Bell asserts that it was improper for the district court to make a "hypothetical" adjustment to its tax liability based upon an allocation of a portion of AT&T's interest expense to Bell. However, it appears that rather than attempting to adjust Bell's net operating revenue, the district court was endeavoring to adequately account for Bell's actual tax liability under the consolidated return. A number of cases have considered the effect of this method of tax reporting. See, *Ches-*

*apeake & Potomac Tel. Co. v. Public Service Comm.*, 230 Md. 595, 187 A.2d 475 (1963); *City of Pittsburgh v. Pennsylvania Public Utilities Comm.*, 182 Pa.Super. 551, 128 A.2d 372 (1956); *Riverton Consol. Water Co. v. Pennsylvania Public Utility Comm.*, 186 Pa.Super. 1, 140 A.2d 114 (1958); *Southwestern Bell Tel. Co. v. State Corporation Comm.*, 192 Kan. 39, 386 P.2d 515 (1963); *Federal Power Comm. v. United Gas Pipe Line Co.*, 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967). These cases hold generally that when a consolidated return is filed, the subsidiary should not be allowed to receive credit for more than its proportionate share of the consolidated tax liability. We concur with this rule. See, *Northern Natural Gas Co. v. Commissioner of Revenue*, Minn., 251 N.W.2d 125 (1977). The district court properly limited Bell to a deduction from operating income of only its proportionate share of the consolidated AT&T tax liability.

(b) *CWA Wage Contract.* On July 18, 1974, during the original hearings before the PSC, Bell concluded negotiations with the Communications Workers of America for a nonmanagement wage increase. Bell amended its application before the PSC on August 22, 1974, to request additional revenues to reflect the impact of this wage increase. Bell presented evidence that additional revenues of $7,711,000 would be necessary to offset this increased operating expense. In its first order, the PSC stated that, while some portion of the effect of the wage contracts should be taken into account in determining Bell's revenue requirements, it would be inappropriate to allow the full increase sought by Bell. The PSC thus allowed 50 percent of the increase, or $3,855,500. The district court was not satisfied with the PSC's explanation for this allowance and requested a more detailed statement of the reason for the PSC's action. On remand, the PSC stated that since approximately one-half of the impact of the wage increase would be realized during the one-year period after the test year, it found the 50–percent adjustment to be appropriate. On the second

appeal, the district court was satisfied by this explanation.

The state objects to consideration of any effect of the wage contract, arguing that it is beyond the test year under consideration. Bell asserts that the entire impact of the wage contract should have been allowed.

██ The test-year concept is designed to produce a measure of a regulated utility's earnings for a known period of time, to enable the regulatory body to make an accurate prediction of revenues and expenses in the reasonably near future. Based upon the evidence presented, the regulatory body undertakes a reasoned exercise of its discretion in altering test-year data to reflect changes of known magnitude occurring subsequent to the test year. *Public Service Co. of New Hampshire v. State*, 102 N.H. 150, 153 A.2d 801 (1959); *Southern New England Tel. Co. v. Public Utility Comm.*, 29 Conn.Supp. 253, 282 A.2d 915 (Super.Ct. 1970).

██ In the instant case, the PSC considered the evidence of the CWA wage contract and its effect on Bell's operating expenses beyond the test year. While the existence of the wage increase itself was not disputed, the PSC participating staff introduced rebuttal testimony to the effect that the wage increase would be offset by increased productivity and favorable growth in revenue. Weighing all of this evidence, the PSC determined that, while it would be appropriate to make an adjustment for the next year, any adjustment beyond that period would be speculative.

In determining the extent of the allowable adjustment, it appears that the PSC was acting in both a judicial and a legislative capacity. In finding as a fact the amount of the 1974 impact of the contract, the PSC's decision was amply supported by the evidence. In deciding to limit the adjustment to a one-year period, the PSC determined as a matter of public policy that changes occurring more than one year beyond the test year would best be considered in proceedings taking into account all of the facts necessary to accurately set Bell's rates. This determination cannot be said to be arbitrary or unjust. The PSC's treatment of the wage increase must be affirmed in both respects. *St. Paul Area Chamber of Commerce v. Minnesota Public Service Comm.*, Minn., 251 N.W.2d 350 (1977).

Because of our decision, we need not consider the other issue raised by Bell relating to the denial of the petition for rehearing.

We affirm the orders of the district court insofar as they relate to rate base and operating revenues; we reverse the district court on the issue of rate of return, and remand with instructions that the original determination of the PSC regarding rate of return be reinstated.

MacLAUGHLIN, J., took no part in the consideration or decision of this case.