**NORTHWEST AIRLINES, INC., Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. 47568.

Supreme Court of Minnesota.

March 24, 1978.

Johnson & Eastlund and George R. Johnson, Minneapolis, for relator.

Warren Spannaus, Atty. Gen., C. H. Luther, Deputy Atty. Gen., Richard W. Davis, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for respondent.

YETKA, Justice.

Writ of certiorari upon relation of the taxpayer, Northwest Airlines, Inc. (Northwest), to review a decision of the Tax Court affirming the 1970 and 1971 assessments of airflight property tax by the commissioner of taxation (now commissioner of revenue). The Tax Court found that the value placed on the Northwest fleet for 1970 and 1971 was not excessive but that the assessment ratios of 35.4 percent and 34.2 percent were

illegal. Northwest seeks review of the former determination; however, the state does not seek review of the latter. We affirm.

Airflight property, including aircraft, is taxed under Minn.St. 270.071 to 270.079, first enacted in 1945. The tax is determined pursuant to a statutory formula which allocates a fractional portion of the value of flight property to its use in Minnesota. A specified mill rate is applied to the value so apportioned.[1]

Prior to 1963, the commissioner had determined the "full and true value" of airflight property at 100 percent of the market value apportioned to Minnesota.[2] After the airlines appealed their 1961 and 1962 assessments, a settlement was reached between the commissioner and the airlines. It was agreed that the assessment ratio would be 50 percent in 1960 and 1961, 45 percent in 1962, and would be reduced 1.2 percent per year until the statewide ratio of 33⅓ percent was reached.

The valuation formula used for 1960 through 1967 was the so-called "20–10–10" formula. Under this formula, the value of an aircraft was determined on a cost-less-depreciation basis. The market value was determined by reducing cost by 20 percent the first year and by 10 percent per year thereafter to a residual value of 10 percent. In 1968, the formula was altered so that after the first year's 20-percent depreciation the property was depreciated over a

1. Minn.St.1969, § 270.074, provided: "Subdivision 1. The commissioner shall determine the full and true valuation of all flight property operated or used by every airline company in air commerce in this state. The valuation apportioned to this state of such flight property shall be the proportion of the total valuation thereof determined on the basis of the total of the following percentages:

"(1) 33⅓ percent of the percentage which the total tonnage of passengers, express and freight first received by the airline company in this state during the preceding calendar year plus the total tonnage of passengers, express and freight finally discharged by it within this state during the preceding calendar year is of the total of such tonnage first received by the airline company or finally discharged by it, within and without this state during the preceding calendar year.

"(2) 33⅓ percent of the percentage which, in equated plane hours, the total time of all aircraft of the airline company in flight in this state during the preceding calendar year, is of the total of such time in flight within and without this state during the preceding calendar year.

"(3) 33⅓ percent of the percentage which the number of revenue ton miles of passengers, mail, express and freight flown by the airline company within this state during the preceding calendar year is of the total number of such miles flown by it within and without this state during the preceding calendar year.

"Subd. 2. The method prescribed by subdivision 1 shall be presumed to determine fairly and correctly the value of the flight property of an airline allocable to this state. Any airline aggrieved by the valuation of the flight property or the application to its case of the apportionment methods prescribed by subdivision 1, may petition the commissioner for determination of the valuation or the apportionment thereof to this state by the use of some other method. Thereupon, if the commissioner finds that the application of the methods prescribed by subdivision 1, will be unjust to the airline, he may allow the use of the methods so petitioned for by the airline, or may determine the valuation or apportionment thereof by other methods if satisfied that such other methods will fairly reflect such valuation or apportionment thereof.

"Subd. 3. The flight property of every airline company shall be assessed at 33⅓ percent of the full and true value thereof apportioned to this state under subdivision 1."

The 1969 statute was in force for the tax years in question, 1970 and 1971. Taxes were assessed as of December 31, 1969, and December 31, 1970. For consistency, the assessments will be referred to as the 1970 and 1971 assessments.

2. In 1971, the term "full and true value" was deleted from § 270.074 and the term "market value" was substituted. Laws 1971, c. 427, § 15. Minn.St.1969, § 272.03, subd. 12, defined "full and true value" as follows: "Full and true value shall constitute adjusted market value. Adjusted market value is the market value reduced by applying thereto the percentage of market value which the assessor is applying to the taxable property in the district in which he is assessing." This subdivision was repealed in 1971, when the term "market value" was substituted in the tax statutes. Laws 1971, c. 427, § 26.

The "assessment ratio" at issue in the present case must be distinguished from the 33⅓ percent statutory ratio found in 270.074, subd. 3. In this opinion, "assessment ratio" refers to the percentage applied to market value to arrive at full and true value pursuant to § 272.03, subd. 12.

10-year period to a 10-percent residual. The result of this was an increase in useful-life calculation, a smaller yearly depreciation write off after the first year and thus an increased value. Paul Lethert, Northwest's Director of Taxes, testified that this formula correctly determined the market value of the aircraft and correctly reflected the airline's historical experience of an approximate useful economic life of 8 to 10 years.[3] He testified that the 20-percent, first-year depreciation was justified by the standardization[4] necessary to put an airplane in the Northwest fleet and by rapid first year reduction in remaining available flight time.

In the 1970 assessment letter, the commissioner announced a new formula for determining the value of the airflight property. A "9–10–10" formula in which the property was depreciated at a rate of 9 percent per year to a 10 percent residual value after 10 years was employed. This formula is the so-called "California method." The assessment ratio was 35.4 percent pursuant to the 1963 agreement. Northwest appealed the 1970 assessment to the Board of Tax Appeals (now Tax Court).

After the 1970 assessment, the commissioner and the airlines entered into negotiations over the 1971 assessment, and the commissioner proposed a modified version of the California method. Under this formula, the aircraft would be depreciated 5 percent the first year and 10 percent each year thereafter with varying residual values, depending on the type of aircraft.[5] The airlines were told that if they refused to accept the formula, the commissioner would make assessments based upon the Civil Aeronautic Board's (CAB's) depreciation schedule.[6] Use of the CAB formula would greatly extend the calculation of useful lives of the aircraft and lower their residual values. The use of that formula thus results in significantly increased valuations. The commissioner felt that this schedule more realistically reflected actual depreciation. The airlines were told, however, that if assessments were made using the CAB formula, it would be possible to settle any subsequent appeals on the basis of the California method because the commissioner wished to avoid costly litigation. The airlines were also told that they would have to waive any right to appeal if they accepted the California method compromise.

After Northwest rejected the offer, the commissioner proceeded to assess the airlines uniformly on the basis of the CAB formula. After appeals were filed, settlement offers were made to all the airlines with the exception of Northwest. Throughout the negotiations, the assessment ratio offered and ultimately used was 34.2 percent, pursuant to the 1963 agreement. One witness testified that the settlement offer was not made to Northwest after its appeal because there was not enough time, due to the consolidation of appeals, and in any case it was thought to be futile. At trial, the commissioner offered to compromise Northwest's appeal using the California method and an assessment ratio of 34.2 percent. This offer was not accepted. Apparently all the other airlines accepted a compromise based upon this method.

Northwest's appeals to the Tax Court from the 1970 and 1971 assessments were consolidated on its own motion. At trial, 6 days of testimony by 17 witnesses, including many experts, and 48 exhibits were present-

3. With proper maintenance the useful *physical* life of an aircraft is apparently indefinite. In the present case, the dispute over useful life is a dispute over the useful *economic* life to the airline.

4. Standardization is the process of modifying an aircraft to meet the specific needs of the airline.

5. Although the first year's depreciation was less than that allowed in California, the commissioner proposed to allow full first year depreciation regardless of actual acquisition date as opposed to monthly depreciation. Generally, the California method was a 9–10–10 formula.

6. The CAB's depreciation schedule is a schedule of useful lives and depreciation practices which the CAB compiled in a major ratemaking inquiry conducted in 1970 and 1971.

ed. The Tax Court found that the 1970 and 1971 assessments were not excessive, but it found that the assessment ratios applied by the commissioner were illegal. The state does not seek review of the latter determination.

The issues presented upon appeal are:

(1) What is the proper standard of review and scope of review of a Tax Court's decision on the issue of whether an assessment by the commissioner is excessive?

(2) To what extent may the commissioner rely upon formula valuations in the assessment of airflight property?

(3) Was there sufficient competent evidence to support the Tax Court's finding that the 1970 and 1971 assessments were not excessive?

■■■ 1. Northwest's initial argument is that the commissioner erred in assessing Northwest's airflight property. It contends that assessments of the value of property for tax purposes must give consideration to all the relevant factors affecting the value of the property assessed. *Schleiff v. County of Freeborn,* 231 Minn. 389, 394, 43 N.W.2d 265, 268 (1950); cf. *Xerox Corp. v. County of Hennepin,* 309 Minn. 239, 243, 244 N.W.2d 135, 137 (1976).[7] If the assessor, however, fails to consider all the relevant factors, the taxing authority may present additional previously unconsidered, relevant evidence to the Tax Court to support its valuation. Once the taxpayer has rebutted the prima facie validity of the assessor's valuation, *Red Owl Stores, Inc. v. Commissioner of Taxation,* 264 Minn. 1, 117 N.W.2d 401 (1962), and *Schleiff v. County of Freeborn, supra,* and additional evidence is introduced, the standard of review is the same as for any other trial without a jury: the Tax Court's finding must be upheld unless clearly erroneous. *Crossroads Center, Inc. v. Commissioner of Taxation,* 286 Minn. 440, 444, 176 N.W.2d 530, 534 (1970); *In re Northerly Centre Corp. v. County of Ramsey,* Minn., 248 N.W.2d 923, 926 (1976).

Thus, even if the commissioner failed to properly assess the airflight property, the additional evidence presented at trial could support the Tax Court's decision. The taxpayer, however, always retains the ultimate burden of proof.

In the present case, the Tax Court did not specifically find that the prima facie validity of the commissioner's valuation had been rebutted, but it did find the value of the property to be the same as that assessed by the commissioner. The memorandum which accompanied the decision makes it clear that all the testimony and documentary evidence was considered in reaching the decision.

■■■ 2. The second issue before us is whether the commissioner's prima facie case of valuation was rebutted and, if so, whether the evidence still reasonably supports the valuation.

The complexity and difficulty of the problem faced by the Tax Court was succinctly set out in its memorandum:

"We recognize that the valuation of aircraft of a commercial airline is a difficult problem of proof. No matter which witnesses are called, the valuation they might testify to is rather difficult to substantiate with comparable sales or other criteria that might be as reliable as the supporting data used in valuation of other types of property. Although we encourage the most reliable proof possible, we are reluctant to require that any party meet the standards set forth in the real estate valuation cases where comparable sales data and actual inspection of each aircraft in the fleet might be required. Indeed, all of the witnesses seemed to feel that the entire fleet could be valued without individually inspecting each airplane and appraising the fleet one aircraft at a time. All of the witnesses felt that a formula approach to valuing the entire fleet would truly reflect mar-

---

**7.** Northwest's contention that Minn.St. 273.08 and 273.12 require the assessor to actually view the property is mistaken. Sections 273.08 and 273.12 are applicable to real property. Be-

cause of the variety of personal property involved here, this would be an impractical requirement.

ket value. We find no reason to reject such proof in the light of all the testimony."

Northwest cites *Independent School Dist. No. 99 v. Commr. of Taxation*, 297 Minn. 378, 211 N.W.2d 886 (1973), for its proposition that the commissioner cannot rely on a formula valuation. *Independent School Dist. No. 99* involved the use of a cost-less-depreciation formula in the 1966 assessment of certain utility property. This court in reviewing the use of the formula stated:

"The difficulty we have with the formula approved by the Tax Court is that it makes market value synonymous with original cost, taking into account limited depreciation, and gives no weight to other factors affecting market value. As we have indicated in numerous decisions, original cost is only one of several relevant factors which should be considered in determining market value. See, e. g., *Crossroads Center, Inc. v. Commr. of Taxation*, 286 Minn. 440, 176 N.W.2d 530 (1970); *Alstores Realty, Inc. v. State*, 286 Minn. 343, 176 N.W.2d 112 (1970). The reason other factors such as reproduction cost, earning capacity, and comparable sales prices should also be considered is because the statutes referred to, read together, require that assessing authorities 'consider and give due weight to every element and factor affecting market value thereof * * *.' § 273.12." 297 Minn. 384, 211 N.W.2d 890.

*Independent School Dist. No. 99* was concerned primarily with real property and is thus in part distinguishable from the facts of this case because of the historically unique character of real property.

The *Independent School Dist. No. 99* case, however, made two additional points which are relevant to the present case. This court found that the primary error of the lower court in that case was its failure to determine market value de novo. Apparently the lower court simply found that the formula had been lawfully adopted. In the present case, the Tax Court specifically determined the value of the aircraft. Additionally, this court also stated that a formula could be used if it most accurately reflected market value.

The Tax Court in the present case concluded that a formula approach would truly reflect market value and that there is support for that conclusion. What is at issue, however, is which formula most accurately reflects the market value. All witnesses agreed that cost less depreciation is a proper method for valuing aircraft, but they disagreed on the rate of depreciation and the length of useful lives.[8]

The 1963 agreement provided for 20-percent depreciation the first year and 10 percent per year thereafter to a residual of 10 percent. Northwest's witness testified that this formula correctly reflects market value because it takes maintenance and standardization into account. Northwest presented testimony purporting to show that useful economic life was less than that reflected in the CAB formula and that the CAB schedule reflected book value which was a cost-recovery accounting device. Northwest's evidence was sufficient to rebut the state's prima facie case, and the burden shifted to the state to present additional evidence to support the commissioner's valuation. The state could show either that the commissioner's formulas more accurately reflected market value than did Northwest's, or it could show an independent valuation. The valuation arrived at by use of a formula was not clearly erroneous.

3. Finally, Northwest argues that aside from the commissioner's assessment, the other evidence relied upon by the Tax Court is inadmissible hearsay, improper expert opinion, or without probative value. We cannot agree with its claim.

■ It is clear from the findings and the memorandum of the Tax Court that it gave careful consideration to all of the evidence presented by the parties. Its determination that an expert witness could rely

8. This is not strictly true of Donald Hardesty, a Northwest vice president. Although he began with "book value" (cost-less-straight-line depreciation), he subtracted another factor based on unperformed maintenance.

upon reports of sales of aircraft and aircraft parts filed with the CAB by regulated airlines throughout the country, was correct with the proviso that the expert also considered other independent relevant evidence in arriving at value. In this case, one of the state's experts, Jordan Greene, was an attorney at law with a background as an airline consultant and aircraft broker. He is the owner and publisher of AVMARK, a magazine devoted to reporting and analyzing the market values of aircraft. In addition to publishing CAB data, AVMARK publishes editorial comments and market projections.[9]

Greene testified that the following six factors were important in the valuation of aircraft: initial price, availability, demand, function of the aircraft, projected life, and future modifications expected. He testified, as did Northwest's vice president, Donald Hardesty, that individual factors which determine price are not computed in determining market value. Greene testified that his opinion took maintenance into account in that it assumed a theoretical 50-percent maintenance standard, which could well have been found to reflect the actual condition of Northwest's fleet. Greene gave his opinion that market value does not drop faster in the first year and that standardization does not affect value. He was not familiar with the specific individual planes in the Northwest fleet and valued the aircraft by type. Greene's personal experience, beyond use of the disputed materials, qualified him to express an opinion. His opinion of value was based upon a cost-less-depreciation formula.

Greene's opinion was not significantly discredited on cross-examination, and his testimony would have been sufficient by itself to support the valuation used by the Tax Court.[10]

The Tax Court's memorandum clearly indicates that that court took into consideration such other relevant matters as book value, depreciation, insured value, and obsolescence. On the latter point, the Tax Court specifically noted that the aircraft will not be rendered obsolete as rapidly in the future as in the past for the following reasons:

" * * * The next generation of aircraft to replace the current family of wide-bodied, three or four engine jets are the super-sonic transports. It is unlikely that the super-sonic transport may ever replace the current family of jet aircraft because of environmental problems and other technical and economic difficulties that may be encountered in attempting to make that aircraft operational. This would indicate that the economic obsolescence is unlikely to occur as frequently in the future as it has in the past. Certainly, there will be improvements in the type of aircraft being flown even if the supersonic transports don't become a reality. These types of improvements are likely to be less devastating to aircraft values than has been the case over the last 30 years."

The Tax Court made it clear that it used the evidence judiciously and that it admitted and considered much disputed evidence for limited purposes. We are convinced that the Tax Court relied upon competent, admissible evidence in reaching its decision. In short, the Tax Court's findings are not clearly erroneous. The evidence introduced supports the independent findings of the court, and therefore it must be affirmed in all respects.

Affirmed.

SHERAN, C. J., took no part in the consideration or decision of this case.

---

9. In light of his experience and other credentials, the fact that Greene had relatively little brokerage experience with the specific types of aircraft in Northwest's fleet goes to the weight and not the admissibility of the evidence. It is for the trial court to determine the sufficiency of foundation for expert testimony, *State, by Mondale v. Mecklenburg*, 273 Minn. 135, 140 N.W.2d 310 (1966), and the weight to be given it, *Alstores Realty, Inc. v. State*, 286 Minn. 343,

176 N.W.2d 112 (1970). The Tax Court did not abuse its discretion in allowing Greene to testify.

10. The Tax Court's valuation need not be the same as that of any particular expert as long as it is within permissible limits. *In re Northerly Centre Corp. v. County of Ramsey*, Minn., 248 N.W.2d 923, 927 (1976).